And will you call the next and last case of the call, please? 3-13-0137, Brian Dakin, et al., appellants by John Spezia v. Thomas Pledge, from the Denver County Sheriff's Department, appellates by Craig Donner. Mr. Spezia? Thank you. May it please the Court. Counsel, Justices of the 3rd District Appellate Court, my name is John Spezia. I'm here on behalf of Amanda Dayton and Brian Dayton, as Special Administrator of the Estate of Jill Dayton. As the Court knows, this case arises out of a collision between a McDonough County Sheriff's Police Officer and a minivan that was being driven by Amanda Dayton. The passenger in the minivan, Jill Dayton, died as a result of the crash. This particular case has several unique aspects. I think in 20 years I've never seen a case where we have actual live footage of a crash. We have live footage in this case, actual real-time footage, of how this crash unfolded and the events leading up to it. The second unique aspect of this case is that the evidentiary issue at the heart of this appeal was addressed by this Court in an opinion authored by Justice O'Brien in 2012, the case of Johnson v. Bailey. It's an evidentiary issue that this Court has addressed no less than three times. It's an issue that this Court has never wavered on, an issue that this Court has never been unclear about, and that is the evidentiary foundation required for demonstrative evidence. The cases deal with photographs. This particular case deals with a video, but I would submit to the Court that the standard is no different. This Court has always held that before a photograph may be admitted, a proper foundation must be offered, establishing, one, that the photograph, or in this case the video, is true and accurate representation of what it purports to portray, and number two, that the subject of the photo was in substantially the same condition as it was at the time of the accident. A second foundational requirement that this Court has repeatedly imposed is that demonstrative evidence should not be admitted if they are inaccurate  Now, I will also point out that in both the Johnson case in 2012 and in the J.L. Simmons case previously decided by this Court in 1984, both of those opinions reject the notion that a party can explain away inaccuracies in demonstrative evidence. This case is also unique because I would submit to this Court that if we simply apply the principles in Johnson to these facts, it is clear that no proper foundation was ever laid for the video that was created by the defense at the trial of this case. This appeal, the reason we are here today, is because of a videotape. We call it in our briefs the defense video. It was created by a defense expert accident reconstructionist. It was allowed into evidence despite the fact that it failed, and I might add failed miserably, to meet the foundations set by this Court on three separate occasions. The defense video in this case is undisputedly inaccurate. The defense and their expert acknowledge that it's inaccurate. The events shown that are purported to be from the view of Amanda Dayton in the minivan undisputedly did not happen on the night of the crash. First, the video is taken from a static position, which Amanda Dayton was never in, on the night of this crash. At all times, the police video shows her moving through the intersection, yet this is taken from a static position. The defense video shows one minute and 24 seconds of emergency lights traveling southbound on Route 67. Now we know, and it's undisputed, that that did not happen. Amanda Dayton never had the ability, even, to see the squad car lights for a minute and 24 seconds. How do we know that? Because as we pointed out to the Court, Officer Pledge, the Sheriff's Department officer, wasn't even in his car a minute and 24 seconds before the crash. In fact, if you look at the timeline that we've provided, Officer Pledge wasn't in his car a minute and 15 seconds either. And at speeds of 100 miles an hour, we're talking about huge gaps in time here, huge distances that can be traveled. The defense video slows down the vehicles that are traveling southbound to 40 miles per hour when we know that the officer reported traveling in excess of 100 at one point 110 miles an hour within the city limits. To confuse the conspicuity of the SUV, the lights are illuminated in the defense video, not the case on the night of the crash. I'd like to take the opportunity to answer a few questions that were raised in the defendant's brief in this case. Here's the first one. Question. How many times must the defendants explain that the, quote, line of sight video was never intended to portray the incident or explain how it happened? Here's the answer. None. No more. No more need to try to characterize this video as some limited purpose. No more. It doesn't matter how many times they say line of sight in this case. It will never be true. It will never be accurate. We need only look at the trial transcript here to see that this video was used for far more than a limited purpose. Defense counsel, quote, once again, this is a visibility study of what the certified accident reconstructionist recreated as far as what her visibility would have been under almost identical circumstances. That's defense counsel. This isn't just a line of sight. In his opening statement, quote, the point of this visibility study, you will see it on the video, is to give you an idea of what Amanda Dayton either could or should have seen that night. Again, it's undisputed that Amanda Dayton did not and could not have seen emergency lights for a minute and 24 seconds. This limited purpose argument, incidentally, is rejected in the Johnson case. You will recall in the Johnson case that there was an argument that the photograph of the parking lot was for a limited purpose. This court rejected that argument and said that photograph showed more than what the proposed limited purpose was. Same in this case. This isn't a visibility study. This isn't a photograph from the intersection showing what it looked like northbound. Much more than that. They added the cars. They added the time. And there was a reason that they did that. And we'll get to that. But if there was any question that this was more than a line of sight, then I would have the court just listen carefully and look carefully at the question and answer. This is the first question and first answer that happened after the jury saw the defense video. Here it is. Question. The video has now concluded and it is approximately a minute and 24 seconds. Does that correspond with your recollection was as far as the length of the time of the video you shot? The defense expert. Yes, sir. So we're talking about the defense video. Here's the next question. Question. Based on that video and some of the other things that we've talked about, in your opinion, what or how long would Amanda Dayton, in seconds or time-wise, would have had to appreciate and observe the oncoming emergency vehicle? They've turned this into a perception reaction time study. And here's his answer. Defense expert. Well, first off, based on the video, again, the video is in a stagnant position. She didn't sit and observe it that whole time. That's not what I'm trying to say. I'm saying it was viewable for that entire time. This isn't a visibility study of what you might be able to see. This is an effort, a clear effort to extend the perception reaction time, to distort it, to show that this girl had a long time to perceive this SUV that had no lights on, to perceive a squad car that was closing at 110 miles an hour in a 40 mile per hour zone. And as for the prejudicial impact of the video, once again, we need look no farther than defense counsel. Here's what he said about the defense video and its importance in the case. Quote, this is absolutely the type of evidence that a jury is going to want to see and needs to see to fully evaluate all of the facts and circumstances before they render a verdict in this case. Oh, yeah. This was a critical piece of evidence in this case. Now, this court has addressed prejudicial impact in the standard and found that in cases that prejudicial impact can be found where demonstrative evidence was, quote, likely to mislead a jury, where demonstrative evidence might confuse or mislead a jury. It is found that where photos have objects that are arranged to favor one party's theory of the case, it's prejudicial. Similar to the Illinois Supreme Court in the French case, where the court held where demonstrative evidence is geared toward preconditioning the minds of jurors to one side's theory of the case, it should be excluded. All these factors certainly existed in this case. This video was biased to achieve the purpose of the defense. It was biased, and it was staged, and it was skewed to show that Amanda Dayton had plenty of time to react to this. How did they do it? Here's how they did it. They positioned the camera as if the jury would believe that's what Amanda Dayton was looking at. That's the first thing. By the way, fatal flaw in the French case. The Illinois Supreme Court said that was fatal in the French case. Once you position that camera in a way that it shows, you look like you're showing that it's one of the parties, they say no, no, no. That's preconditioning the mind of the jury, especially when it's replete with inaccuracies like here. So what else did they do? Slow everything down. Extend the time period. 40 miles per hour instead of 100, instead of 110. Closing speed of 60 feet per second instead of 145 to 160. Depending if you take 100 to 110 miles an hour. Illuminate the SUV. Why did they do that? Make it more conspicuous. Run the video for a minute and 24 seconds. The cars are in the wrong lanes of traffic. Now why did they do that? Because it minimizes the obstruction. It minimizes the obstruction that Amanda Dayton would have had. You can see in the police video, if you look at it, that there's a portion of the video where the SUV is actually in between the squad car. You can't even see her minivan sitting there. All done, all of this done, all of this calculated to support their comparative fault defense. You know, part of the standard that this court has set for demonstrative evidence is that it cannot confuse or mislead the jury. Look, this just makes sense. These are not high bars that we're asking people to get over here. We're talking about one day in court. And all we ask is that the evidence that you introduce is accurate. Counsel, you have two minutes. I'd like to just address the issue of recklessness. And I'd like to point out to the court, you know, there have been these suggestions about drunk driving and about the menace that drunk drivers are to our society. We can all agree about that. But hopefully we can all agree that's not the issue in this case. The McDonough County Sheriff's Department has a policy about high-speed chases. And that policy is that you can engage in a high-speed chase only if there is an actual or threatened attack. DUI is not on the list. And I'm sure there's a good reason for that, because we don't want anybody driving 100 miles an hour, but we certainly won't want drunk people driving 100 miles an hour trying to keep ahead of speeding police vehicles. I'm going to close with this. One final unique aspect of this case. One final unique aspect. And it's this. And I think this is going to be true even when we walk out of here today. The defense has never shown in the record, never shown any testimony that a proper foundation was laid before the defense video was admitted in evidence. They have never pointed to the record to show us where they established that it was true and accurate. They've never pointed to anywhere in the record to show that it was substantially the same conditions. And I think that will be true when we leave here today. Thank you very much. Mr. Unrath. Good afternoon. My name is Craig Unrath. I represent Deputy Thomas Pledge in the McDonough County Sheriff's Office. We have a drunk driver heading toward a population center on a holiday evening doing over 100 miles an hour. It's at night, dark. His headlights are turned off. You're a police officer. How do you respond to that? Don't spend five or ten minutes or think about this. Decide now, because that's what he had to decide. Right then and there, what do you do? Do you let this car head into Macomb at high speed with his headlights turned off, or do you pursue with your lights flashing and sirens blaring, giving warning to everyone up ahead just what's coming their way? Would you agree that the video was demonstrably? That's an experiment. It's completely different. This is entirely different from holding up a photograph and saying, this is the condition of the factory floor, which was done in the French case. When it clearly was not. In our case. What kind of experiment were you doing then? You were demonstrating something related to the accident, correct? We were actually responding to deposition testimony of plaintiff's expert. Plaintiff's expert in discovery said, he said, you know, the Dayton vehicle, they wouldn't have had a full, clear view of the police car coming down this hill for that half mile because it might have been obstructed by trees and other things. Well, I can understand why you would want the evidence in. What I'm asking is, was there any foundation ever presented for this? Absolutely, Your Honor. This was covered pre-trial on motion and limiting. It was covered at trial. And our foundation? What was the foundation? The foundation is that it was limited to a specific test, a specific test to establish line of sight. Nothing more. And that was made clear at every stage of this trial. And I'm starting with motion. Is that the only thing the foundation presented? That it was only intended for line of sight? None of the other things about same kind, similar kinds of conditions? Oh, absolutely not, Your Honor. As a matter of fact, the counsel earlier on, he said that these tests are used to precondition the minds of jurors to accept our view of the case. Do you honestly believe that it was our view of the case that these cars were only moving at 40 miles an hour? That's ridiculous. The first minute of opening statements, plaintiff's counsel got up there and mentioned the speed of these vehicles as being in an excess of 100 miles an hour. In the second minute of opening statements, they showed the video, which gives clear graphic testimony that these cars are moving at a very high rate of speed, and you have Deputy Pledge announcing on his radio what his speed was. Now, we are going to put up a video that says, ladies and gentlemen of the jury, these cars were actually really only moving at 40 miles an hour. That's ridiculous. Was this experiment on line of sight similar to what happened at the accident? Similar to? It was similar in that it showed that we had over half a mile of clear, unobstructed roadway that trailed up a hill that showed that you could see the Deputy Pledge's vehicle coming down that roadway. We informed the court and the jury that it was not intended to reconstruct the accident. Counsel earlier on mentioned, while the headlights of the lead car, the SUV, were turned on. That makes it easier to see. When the lights are turned off, it's silhouetting the Deputy Pledge's car. The flashing lights become even more visible. Line of vision we're talking about for the accident is a person in a moving vehicle, correct? Pardon me? It's a person in a moving vehicle. It is what? Line of vision. Was it stationary? Yes. The person, this was, the camera was set up to demonstrate that there was a clear, unobstructed line of vision from the top of that hill all the way down, which exceeded over a half a mile. That's all it was there for. That's all it was there for, and it was prepared with the sole intent of rebutting  which we assumed would be repeated at trial. We had to do this. But that wasn't, that evidence was not introduced at trial, was it? They didn't testify to it? It was not, but the fact remains that we still have a right to show that there was an unobstructed view. Now, it's true, at one point, the lead SUV blocks the car, and that happened, that's shown in the squad car video. It's also shown in ours. The line-of-sight video was never intended to show that these cars were moving at 40 miles an hour, and if it was, we would have looked like idiots because no one, no one disputed that these cars were moving at a very high rate of speed. But to establish a line-of-sight, did you really, I mean, if that is for the limited purpose, and you acknowledged you weren't trying to establish that it was 40 miles an hour or these other things, but line-of-sight is strictly seeing a distance, would you have needed any vehicle? I mean, because otherwise, I think that you have, don't you have to establish that the eye's reaction to the different speeds? I mean, that the way we perceive objects as they travel is different if you are showing something at 40 miles an hour as opposed to something that's at 100 miles an hour? When all you're trying to do is show that those lights were unobstructed, there is no difference. We're not trying to establish a perception. Then it's a scientific fact that, I mean, I'm not aware of any scientific evidence that was introduced at trial to show that this would change. The fact remains is that we were attempting to show that there was an unobstructed view of this car, this squad car, with its lights flashing, and that's all the video did. I want to be clear. So you're telling me, as far as the foundation, the only thing you have for a foundation is that you're only going to deal with line of vision. That's it. Period. And we made sure that the trial court understood that, that the jury understood that, and they understood that numerous times all the way through. And this Court's ruling in the Galindo v. Riddle case states that where an experiment is not represented to be a reenactment, and we clearly didn't do that. From the beginning of opening statement all the way through closing argument, we reminded the jury that it was not a reenactment, it was not a reconstruction. Under Galindo, where an experiment is not represented to be a reenactment, and it deals with one aspect or principle, which is exactly what we were dealing with here, directly related to the occurrence, the exact conditions need not be duplicated. But there is a requirement of substantial similarity that would apply to the particular aspect or principle that you're trying to present. This is true. It had to be accurate and similar to the line of vision. Moving the cars at 100 miles an hour would have made no difference at all, Your Honor. You still would have seen this. The only difference would be is that in preparing the test, we would have been placing people at risk. We didn't do that. It would have been foolish to have a couple of cars, particularly one of them with their headlights off, running at 100 miles an hour down this just to produce a line of sight. The fact remains is that the time element is completely unimportant. The only thing that's important is that there was an undivided segment of time where there was no obstruction. Let me ask you, if the time is unimportant, which we agree it is, why do you have a timer running on that video? The timer, and counsel mentioned this before, a testimony at trial where our expert, he said, well, was it a minute and 24? And he said, yes, and there's a reason for that because he had been asked, have you edited this video? And he said, no, I have not. He said, it was a minute and 24 when I recorded it, and it's a minute and 24 now. That proves that we didn't edit the tape. That's all it does. And that's why we've got that timer in there that further establishes the veracity of the evidence. That's all. Now, we have another... That's the way it was argued. Yes, that's the way it was pointed out. That's precisely what was done. That's why he asked him that question. He asked him, what was the length of this video? Is that the time you spent when you originally filmed it? Did you edit this? And he said, no, I did not edit it. This is the true version of the video. We have a number of fundamental considerations in this appeal. First, first one is this. This is a jury verdict rendered by the people who have a vested interest in the manner in which their local law enforcement conduct themselves. This is local. This is McDonough County. This is what they think was done right. This was not a case of negligence. This is a case for willful and wanton conduct. The question is not whether Deputy Pledge made a mistake or was negligent. It's whether he had a conscious disregard for the safety of others. And that is an extremely high standard. And there's another high standard at issue here. Every single issue they raise on appeal is subject to the abuse of discretion standard of review. And what that means is that each one of you, individually, if you disagree with Judge Gambrell's ruling, that's insufficient to overturn. What you need to show is that his decision was arbitrary, that it was beyond the bounds of reason, and that is an incredibly high standard. And finally, we're dealing with one last standard. When this is all said and done, you have to show before you can reverse this case that these errors, if they occurred, and if they were beyond the bounds of reason, have materially affected the outcome of this case. And you just can't do that. Not with a case like this. This was a case that was based, and the arguments are based entirely, on an attempt to show that our jury cannot be trusted to understand the facts. It's based on the notion that by viewing this video, the jury would have completely forgotten all about the squad car video and said, you know what? Maybe those cars really were moving at 40 miles per hour. Of course, we never made that argument. We never wanted that argument. It contradicts our view of the case. And they tried to sneak in testimony all through trial that this was a reconstruction video, and we continually had to respond to that, and we did so on our brief in this appeal, over and over again. They keep calling it a reconstruction video, and here, the worst of it, came on page 7 of their reply brief, and this is a quote. Defense counsel even referred to it as an informal reconstruction. Unquote. That is not true. The two citations they make to the record are page 14 and 412. Page 14 shows that we were talking about the squad car video, not ours. Page 412 is opening statement, where we told the jury it is not a reconstruction. Counsel would have you believe that just by looking at this video, that their entire viewpoint of the case changed. Suddenly, they thought, boy, maybe she really sat there for a minute and 24 seconds watching that car. Of course, the light would have changed a couple of times over a minute and 24 seconds. We never posited that. They continue this line of argument when they talk about their arguments in closing argument. They said that they were prevented from raising the five-second claim, that she could only see the car for five seconds. They claim that this is essential to their case, and yet they chose not to ask their own expert about that. Why would they do that? Let me ask you about that. What do they need an expert for? If they've got a videotape that's got a timer running, and they can look up there and they think... Why do you need an expert to say, well, right here on your timer there's five seconds between A and B. That's how long she had to see it. We're talking about, in closing argument, reasonable inferences from the evidence. In your brief, you talk about that trying to introduce a fact. Well, they're just taking the facts that are out there. On the video, we're talking about it. What's wrong with that? I'll tell you exactly what's wrong with that. They saved this little nugget up to closing argument because they did not... What's wrong with that? What's wrong with that is that they did not want to subject it to cross-examination, because if they had, if their expert had said it was only five seconds, we would have been able to impeach that. When our expert said it was 13 seconds, if he had cross-examined our expert and said, it should be five, we would have been able to show, had he brought this up during the testimony portion of trial, it would have served to confirm that it was 13 seconds. As it is, they put this in their pocket, saved it up when we don't have the ability to cross-examine it. Now we're looking at a very blurry video that the only way that you can really look at this is in stop-action, slow motion. It takes numerous views to do this. Any one of the experts, having viewed this, would have agreed with us. But by saving this up and by avoiding, eliminating any possibility of cross-examination, they avoid that entire problem, and what they're doing here is they're relying on a hope that our jury is not going to be smart enough to figure this out. And this comes up over and over and over in this case. They claim that it was error for our expert, a police officer, to say that you have a duty to yield to oncoming traffic, even though every single person who owns a driver's license knows that to be true. But they assume, oh, boy, maybe this jury really is dumb enough. Maybe they don't know that. Now we take exception to that.  intelligent enough to know the difference between a reconstruction and a line-of-sight analysis. We believe that this jury was perfectly positioned to make this ruling because they are the very people with the greatest stake involved in the outcome of this case. They're the ones that are going to be protected by these officers. We ask the Court to affirm. Thank you very much. Mr. Spasius, a rebuttal? Yes. Thank you. Let's start with this. We don't think the jury's dumb, okay? And here's another thing we don't think. We don't think that we need experts to count the seconds on videos. We don't. What they had here was a professional witness. I've seen Mr. O'Hearn in action. He's pretty good. He talked his way around in this case, and they talked their way into what we call in the trial business a big piece of slop. This evidence was slop. And the reason in the trial business it's called slop is because it sticks to you, and it's prejudicial, and you can't get it off. And that's what they did here. There's some suggestion that they have that we should have expert movie watchers. I wish my wife was here today because my son, she would tell you, would qualify. He would be an expert movie. We don't need expert movie watchers. We don't need people to count the seconds in videos. And the other thing I take exception to is this. And I'm going to read this portion. Our position here is what they're trying to do is they want you to change the standard. We've got to move the goalposts here. We need to change the standard. Let's call this an experiment today. I don't believe that word ever appears anywhere in the trial transcript, experiment. But it doesn't matter anyway because the standard is the same, substantially similar. So let's change that. They resort to characterizing us as calling the jury dumb. Why do they do that? Well, the reason they do that is because what they would have us all believe is that the standard should be that if the evidence is so bad, if they slow the cars down to 40 miles an hour, it's so inaccurate that the jury wouldn't believe it. That's not the standard. The standard doesn't have an exception that says true, inaccurate, substantially similar, except in cases where the evidence is so inaccurate that it's admissible. So we don't need to change the standard here. The opening statement, what they said to the jury is that this, they're referring to the defense video, this is not a formal accident reconstruction, thus the informal accident reconstruction. It's a new way that we can characterize demonstrative evidence. So we'll have informal accident reconstructions. We'll have experiments. We'll have accident reconstructions. We'll have line of sights. There's no need for any of this. This is just a bunch of obfuscation to try to get around the fact that this was prejudicial. We talk here about fundamental principles. I'm glad they brought that up. Fundamental principles. And this is where I want to end. Fundamental principles. The bar is not very high for your one day in court that you would expect that evidence is accurate, that it's not biased for one person or the other. All we want is a fair fight. What is the reason, what is the purpose for the foundation? Simple. Ensure fundamental fairness. Ensure reliability. Neither of those things were done here, and we're asking that this court send this case back for a fair trial. Let me ask you on that line that was brought up. Okay, you've got apparently a drunk coming into town at speeds in excess of 100 miles an hour with no lights on. How are you ever going to convince the jury that the deputy who made the decision to put red lights and sirens on was reckless as a cohesive? You think, well, maybe a, how are you going to jump that? Sure. So the issue of recklessness, we could give a laundry list of what was reckless. It's a university. He knows it's crowded. He knows there's traffic out, and he goes at speeds 100, 110 miles an hour. But here's the real thing.  You don't have to believe my argument. I'm a lawyer. The McDonough County Sheriff has a policy. This deputy officer knew what the policy was, and he violated it. The policy in McDonough County for high-speed chases does not allow for a high-speed chase when you think that a person might be intoxicated. It's not there. It's not my rule. It's their rule. He knew it, and he violated it. But you change that the deputy's not behind him. You change that somebody's speed by a mile an hour or half a mile an hour to your clients or the vans, and just fortuitously, you know, the timing makes that turn, and instead of getting hit by the squad car, it gets hit by the van with no lights on it going at that speed. So what I would submit to the court is this, and they raise this question in their brief. What's more dangerous than having a guy driving, potentially intoxicated? I'll answer that. Two people. All this did is double the danger. So instead of having one vehicle going 100, we've got two going 100, and we've got the guy in front who's going to increase the speeds to stay ahead. I guess I don't think that the jury is, in this case, is going to buy that this was going to end and that there was any purpose for this. This is not a Clint Eastwood movie where he was going to pull up next to him and shoot the tires out. There's no purpose for any of it. There's no purpose for this chase. So I think that there's ample evidence of recklessness here. Most importantly, their own policy. Thank you. Thank you. Thank you both for your arguments here this afternoon. This matter will be taken under advisement. A written disposition will be issued. And right now, the court is adjourned until January.